**EXHIBIT A**



## JOURNAL PUBLISHING AGREEMENT

**AGREEMENT** ("Agreement") made as of September 7, 2017, by and between Elsevier Inc., with offices at 230 Park Avenue, Suite 800, New York, NY 10169 USA with Federal ID no. 13-1958712 (hereinafter the "Publisher") and the American Pain Society, with offices at 8735 West Higgins Road, Suite 300, Chicago, IL 60631 (hereinafter the "Society").

### BACKGROUND

**WHEREAS**, the Society is the owner of the journal entitled The Journal of Pain (the "Journal"); and

**WHEREAS**, pursuant to an agreement dated May 31, 2012 ("Prior Agreement"), the Publisher publishes and distributes the Journal on behalf of the Society, and the parties wish to enter into this new Agreement to replace and supersede the Prior Agreement effective with the initial date of the Initial Term as set forth herein.

**NOW**, it is mutually agreed as follows.

### ARTICLE I
### OWNERSHIP AND RIGHTS

1.1  **Ownership and Grant of Rights.**

1.1.1  Except as set out in Article 1.1.2, the Society is the owner of all copyright and trademark rights in the Journal.

1.1.2  The Society is the owner of the copyright in the Articles other than the Open Access Articles (as defined below), in which the Society is the exclusive licensee.

1.1.3  Subject to the user licenses in the Open Access Articles described below, the Society grants the Publisher the full and exclusive publishing and distribution rights for all or any part of the Journal, worldwide and in all languages and all editions, for print and electronic media and all other media now known or hereafter developed, including all prior issues and volumes of the Journal, and the exclusive right to sublicense such rights, provided, however, the Society shall retain the nonexclusive right to publish guidelines and consensus statements, for other Society programs and purposes, so long as such use does not materially interfere with the revenue opportunities for the Journal, and so long the Publisher's approval is given, which approval shall not be unreasonably withheld. in.

1.1.4  Except as set out herein, the Publisher shall place a copyright notice in substantially the following form in each Article in the Journal:
   "© 20XX American Pain Society. Published by Elsevier Inc. All rights reserved."
The Publisher shall, at its expense, register the copyright for each print issue of the Journal in the name of the Society in the U.S. Copyright Office.

1.1.5 Unless otherwise agreed between the parties, the end user licenses to be applied to Open Access Articles where they appear on the Publisher's online platforms may permit non-commercial uses only, except where a license that permits commercial use is required by a funding body.

The Publisher shall place a copyright notice in substantially the following form on each Open Access Article, which notice may also include a reference to the relevant user license:
"© 20XX THE AUTHORS. Published by Elsevier Inc. on behalf of the American Pain Society."

1.1.6 **Green Open Access.** Unless otherwise agreed in writing, if the Publisher has an agreement with an institution or funding body enabling posting of journal articles in a repository or otherwise after an agreed embargo period, the Journal may be included in the journals governed by that agreement.

1.2 **Use of Trademarks.** The Publisher may include the notice: **The Official Journal of the American Pain Society,** along with other trademarks representing the Society, on the cover of or in other locations within the Journal and on the Journal website, as designated by the Society. The Publisher may include on the Journal its own logo and trademarks, or those of its affiliates for purposes of identifying itself as the publisher of the Journal and may also mention its collaboration with the Society solely in connection with its promotion and distribution of the Journal. The trade name, publication name and other identifying trademarks of the Society will continue to be owned by the Society.

## ARTICLE II
## EDITORIAL POLICIES AND PROCESS

2.1 **Editorial Policies.** The Society (through its Editor-in-Chief) has complete responsibility for the editorial content and policy of the Journal, including without limitation, for conducting peer review of submitted manuscripts and for dealing with any communications received in relation to the content (whether published or unpublished) or editorial management of the Journal. The Society will make all reasonable efforts to ensure that the Journal content is not libelous, unlawful or otherwise actionable and does not infringe any copyright or violate any other intellectual property, privacy or other right of any person or entity. The editorial content and policy of the Journal will be consistent with the Aims and Scope set forth in Annex 2.1. Changes or revisions to the Aims and Scope may be suggested by the Publisher, the Society or the Editor-in-Chief, and any such changes will be made in consultation among them. The Society and the Publisher (together with their agents) will conduct their activities in accordance with generally accepted industry standards for integrity and objectivity. All expenses of gathering and preparing editorial material for publication in the Journal shall be borne by the Society, except as otherwise set forth herein.

2.2 **Roles of Editor-in-Chief.** The Editor-in-Chief shall be selected (and may be replaced) by the Society. The Publisher may accept the editorial directions of the Journal's Editor-in-Chief, or other decisions of the Editor-in-Chief as set forth herein, as being made on the Society's behalf, and the Society shall be ultimately responsible for ensuring the performance of the Editor-in-Chief as set forth in this Agreement and for the cooperation of the Editor-in-Chief with the Publisher. The Editor-in-Chief is responsible for the overall editorial management and development of the Journal, including the timely and efficient coordination of refereeing and submissions and ensuring an appropriate and sufficient level of submissions to meet the publication goals of the Journal. The Editor-in-Chief and editorial office will use the online editorial management/manuscript submission tracking system provided by the Publisher. If the editorial management/manuscript submission tracking system does not reasonably perform or

operate as it is intended, then the parties agree to negotiate in good faith with one another on finding an alternative system for the Editor-in-Chief and editorial office to use.

2.3 **Editorial Board.** Members of the Editorial Board for the Journal will be selected on the basis of expertise and standing within the scientific discipline, knowledge of the subject matter and reflection of the actual or anticipated geographic scope of the scientific discipline of the Journal. The Editor-in-Chief will appoint the members of the Editorial Board.

2.4 **Publisher's Staff.** The Publisher will identify a publishing staff member to oversee the Publisher's performance under this Agreement. This staff member shall be reasonably available to meet with the Society and the Editor-in-Chief to discuss matters relating to the Journal, including its production, publication schedules, layout, design, promotion and distribution.

## ARTICLE III
## PRODUCTION AND PUBLICATION

3.1 **Publisher's Responsibility.**

(a) The Publisher will produce, publish, promote, sell and distribute the Journal in print and online form at its own expense. The Publisher will be responsible for all aspects of production, publication and distribution of the Journal, including production and publication schedules, layout, design and promotion of the Journal, provided, however, that the Publisher consults with the Society and the Editor-in-Chief on the design and layout of the journal and that all first-run promotional materials mentioning the Society or the Journal are approved in advance by the Society, such approval not to be unreasonably withheld or delayed.

(b) The Publisher shall provide initial training and ongoing support services, at its expense, for the use of the Publisher's or, as referenced in 2.2 above, another online editorial management/manuscript submission tracking system for the purpose of performing the editorial activities under this Agreement during the Term.

3.2 **Schedule and Format.**

*Articles.* The Journal contains mainly full-length research papers, review-type articles and other material that is of special interest to the readers of the Journal ("Articles"). Each Article may contain such electronic, interactive and/or database elements suitable for publication online as may be required by the Publisher from time to time.

In addition to Articles published on a subscription basis, the Journal will also include Open Access Articles. Where an author selects the open access option, the Publisher shall charge the author a publication fee for gold open access (the "Open Access Fee") following acceptance of an Article for publication in the Journal. The Publisher will then make those Articles for which an Open Access Fee has been charged ("Open Access Articles") available free of charge at the point of use to both subscribers of the Journal and non-subscribers on the Publisher's ScienceDirect or successor website, pursuant to terms and conditions of use set out in Article 1.1.5.

The Publisher will be responsible for collecting this payment from authors (or their institutions or other designees) following acceptance for publication. Following acceptance, the Publisher will not be required to make an Article available free of charge as an Open Access Article until payment in full has been received.

For the avoidance of doubt, the Open Access Fee shall apply to Open Access Articles that are research papers, review-type articles and other types of content as may be agreed between the parties from time to time.

The published Open Access Fee for 2018 will be $3300 per Open Access Article. Thereafter the Open Access Fee shall be determined by the Publisher in consultation with the Society. APS members shall receive a ten percent (10%) discount on the Open Access Fee.

*Production Schedule.* The Journal shall be published 12 times each year in 1 volume, according to a production schedule to be determined by the Publisher, in consultation with the Society and the Editor-in-Chief. The Society shall ensure that the Editor-in-Chief submits, in a format acceptable to the Publisher, the required number of pages of finished Articles, including illustrations and all relevant supplementary material. Unless directed by the Editor-in-Chief to delay publication, the Publisher will use commercially reasonable efforts to publish the Journal according to the production schedule agreed between the parties. The Publisher shall copyedit and mark for the printer all editorial materials, transmit copyedited materials to the printer and transmit page proofs and illustration proofs, if any, to the author and/or Editor-in-Chief, as appropriate, according to the production schedule.

*Number of Pages.* The Journal shall contain up to 1400 print pages and 48 electronic-only pages of editorial material in 2018, not including front matter and advertising material. The number of print pages shall increase by 24 pages each year. Should the number of editorial pages be exceeded, the Publisher will charge the Society $250 per page in 2018 for such excess editorial pages. The charges for excess editorial pages in subsequent years will be incurred only by prior mutual agreement between the Publisher and the Society and in accordance with any increases in the costs of production or distribution. Either party may suggest an increase in the page budget for the following year, provided such discussion and potential increase are mutually agreed prior to April 30 of the then current year and that such discussion shall include a review of the Society Member subscription rate.

There will be no restriction on the number of Open Access Articles published in the Journal, provided that payments have been received in full by the Publisher for the relevant Articles. For the avoidance of doubt, such Open Access Articles shall not count toward the page budget for the Journal.

*Print Specifications.* The Journal shall be printed in a trim size of approximately 8-1/4" x 11". The Publisher shall maintain high standards of copyediting, proofreading, typography, paper stock, format and photographic reproduction. The format, cover design, paper weight and quality and other production particulars shall conform to the standards embodied in Volume 18 of the Journal.

*Illustrations.* Black-and-white illustrations accompanying editorial text shall be reproduced without additional charge to the Society or authors. Suitable color art submitted to the Journal will appear in color in the online version of the Journal at no charge to the authors.

The Editor-in-Chief may designate a maximum of sixty (60) 4-color illustrations per calendar year and the Publisher shall publish such color illustrations in the print Journal without cost to the Society or authors. The cost of additional color illustrations in the print Journal will be charged to the authors at the rate of $650 for the first color illustration in an article and $100 for each additional color illustration in the same article. The charge for subsequent years may be increased by the Publisher in accordance with any increases in the costs of production.

*Instructions to Authors.* The Publisher shall publish author instructions, which have been approved by the Society, on the Journal website that detail editorial and other requirements for authors.

*Society Content.* In addition to the budgeted pages described herein, the Society may supply the Publisher according to a mutually agreed upon schedule with up to 48 pages per year, in a form reasonably acceptable to the Publisher, of material related to Society business or activities, for publication in the Journal at no charge to the Society.

3.3 **Annual Meeting Abstracts.** The Publisher will produce, at no cost to the Society, a maximum of 250 pages of abstracts from the annual Society meeting as a supplement to the Journal. This supplement will be published and mailed with an issue of the Journal to be determined by the Society in consultation with the Publisher, so long as the Society delivers the manuscript in time to meet the schedule for mailing with that issue. The Publisher may solicit advertising and sponsorships for the annual meeting abstracts to help offset the production and distribution expenses, provided such sponsorships and advertising shall be subject to the Society's pre-approval, which shall not be unreasonably withheld or delayed. The Publisher shall also provide, at no cost to the Society, up to 1200 free print copies of the annual meeting abstract supplement to the Society for its annual meeting.

## ARTICLE IV
## ADVERTISING, PROMOTION AND SUPPORT

4.1 **Advertisements.**

(a) The Publisher shall be solely responsible for and entitled to sell advertising space for the Journal, at rates to be determined by the Publisher. The Publisher shall not publish any advertisement in the Journal that fails to meet the reasonable advertising standards established by the Society and disclosed to the Publisher.

The Society, through the Editor-in-Chief or another individual designated by the Society, may review and approve any third-party advertising for compliance with the Society's advertising policy; however, if a third-party advertisement is not rejected by the Society within three (3) business days of submission to the Society, approval shall be deemed granted.

In the event of any change in the Society's advertising policy or any applicable laws or regulations such that there is a material negative impact on prospective advertising revenues, the parties shall meet to negotiate in good faith an amendment to this Agreement, including, to the extent necessary, any affected financial terms.

(b) The Society may supply, in a mutually agreed upon format, the Publisher with its own advertisements for publication on a space-available basis. The Publisher shall publish such material at no charge to the Society for black-and-white advertisements.

(c) The Publisher may advertise its own products at no charge in the Journal on a space-available basis, provided that the Society's space-available advertisements take priority over the Publisher's.

(d) For print editions of the Journal, advertising shall be placed in two wells, one at the front of each issue of the Journal preceding the editorial text and one at the back of each issue of the Journal following the editorial text. For electronic editions of the Journal, advertising shall be placed in such positions as mutually agreed upon by the parties.

4.2 **Society Commitment and Support.**

(a) The Society will use its best efforts to promote the Journal to its members and to the relevant scientific discipline and will endeavor to stimulate the submission of Articles of the highest professional standard consistent with the Aims and Scope of the Journal.

(b) In order to ensure the scientific and commercial success of the Journal and in consideration of the Publisher's financial commitments to the Society and the Journal as set forth herein, the Society agrees that it will not involve itself in any activities that compete with or otherwise have a materially negative impact on the Journal. If the Society wishes to establish a new journal in the field, it will first offer the Publisher a right of first refusal on reasonable terms and conditions. If the Publisher does not wish to pursue such new journal, or makes no decision within six (6) months after written receipt of the new journal proposal, by the Society may self-publish or otherwise arrange for publication of such journal, but only so long as such new journal does not compete with or otherwise have a materially negative impact on the Journal.

(c) The Society agrees to provide the Publisher, free of charge, with reasonably suitable promotional space for the Journal and related products at its Annual Meeting.

4.3 **Promotion by the Publisher.** By December 31 each year, the Publisher will prepare a marketing plan for the Journal for the following year, including electronic marketing, social media, conference attendance, direct mail and other marketing activities. The Publisher will consider any suggestions of the Society in this respect and may request mailing lists from the Society to be used for these promotional activities.

## ARTICLE V
## SUBSCRIPTIONS AND FULFILMENT

5.1 **Individual Members.**

(a) The Society shall order one (1) subscription to the Journal for each individual member of the Society ("Member"). Member subscribers' access to electronic versions of the Journal shall be pursuant to terms and conditions of use set and enforced by the Publisher.

The Member rate will be $82 for a combined print and electronic subscription to the Journal, $74 for an electronic-only subscription for regular international Members, and $41 for an electronic-only subscription for student Members for the Term (as defined below); provided however that the Member rate may be renegotiated by the parties in the event that they agree to increase the frequency of the Journal or increase the total number of pages for any given year beyond the budget set forth herein. All U.S. regular Members shall receive a combined print and electronic subscription. International Members may receive a print and electronic subscription or an electronic-only subscription, at the Society's discretion. Should the Society wish to provide a combined print and electronic subscription for student Members, the Member rate of $82 will be applied.

The Member rate does not include any sales or similar taxes required by law, which may be billed by the Publisher as appropriate.

(b) Member subscriptions are intended for the personal use of Members only. The Publisher shall be entitled to enforce these terms as a condition of a Member's receipt of a Member subscription.

(c) Fees for Member subscriptions shall be billed on a monthly basis and payment shall be made by the Society within thirty (30) days of receipt of the Publisher's invoice.

5.2 **Other Subscribers.** The published subscription rates for individual Non-Members ("Non-Members") and institutions ("Institutions") shall be determined by the Publisher in its reasonable discretion provided that the Publisher obtains approval from the Society for any increase of 10% or greater of such rates, such approval not to be unreasonably withheld or delayed.

**ARTICLE VI**
**FINANCIAL ARRANGEMENTS AND REPORTING**

6.1 **Royalties.**

(a) The Publisher shall pay the Society a royalty ("Royalty") as follows:

  i. on Revenues directly and normally attributed to commercial sales as recorded in the Publisher's financial records, to include commercial reprints, display advertising, classified advertising, online advertising and sponsored supplements, net of commissions, thirty-three and three-fourths percent (33.75%) up to $300,000, thirty-eight percent (38%) on Revenues from $300,000 to $500,000, and forty-two percent (42%) of Revenues exceeding $500,000. As an example, if the Commercial Sales Revenues are $550,000 in a calendar year, the Royalty shall be calculated as (33.75% x $300,000) + (38.0% x $200,000) + (42% x $50,000).
  ii. thirty-three and three-fourths percent (33.75%) on all other Revenues except Member subscriptions, net of taxes and commissions, directly and normally attributed to the Journal, as recorded in the Publisher's financial records.

For the purposes of this Agreement, "Revenues" shall mean total revenues less deductions for commissions, discounts, returns and taxes. Non-commercial sales shall not include amounts received for excess pages, illustrations or other editorial or production charges for which additional fees apply as set forth herein.

(b) The Publisher shall pay the Society an annual minimum guaranteed royalty as follows during the Term of this Agreement: An amount equal to eighty percent (80%) of projected royalties calculated on August 31 each year for the following calendar year; provided that the Minimum Royalty shall not be less than two hundred fifty thousand dollars ($250,000) for any calendar year during the Term of this Agreement. The Minimum Royalty shall be prepaid in one payment on or before January 31 of each calendar year and shall be deducted from the Royalty due hereunder.

(c) On or before April 30 of each year, the Publisher shall provide to the Society its statement of annual Revenue and the Royalty earned for the preceding calendar year, which shall be accompanied by payment to the Society for any additional Royalty due less any amounts due by the Society to the Publisher hereunder.

(d) The Publisher shall maintain complete and accurate records of all transactions related to the Journal. The Society may, at its expense, audit the relevant Publisher financial records during normal business hours, on thirty (30) days' notice, but not more often than once per year. Any such audit must be conducted within two (2) years from the date of the materials or records to be examined.

6.2 **Editorial Fee.**

(a) During the Term of this Agreement, the Publisher shall pay the Society an annual fee for services provided by the editorial office in connection with the editorial activities under this Agreement. The amount of the editorial fee shall be:

$235,071 in 2018;
$242,123 in 2019;
$249,387 in 2020;
$256,869 in 2021;
$264,575 in 2022 and thereafter.

(b) The fee shall be paid to the Society or to the Society's designee in equal quarterly installments each calendar year in January, April, July and October during the Term hereof.

6.3 **Electronic Payment.** The Publisher shall be obliged to effect payments only by means of a wire transfer or other electronic means. No payment shall be effected by means of cash or check.

6.4 **Editorial Board Meetings.**

(a) Each year during the Term of this Agreement, the Society agrees to hold an annual meeting of the Editorial Board in conjunction with the Society's annual meeting. The Publisher shall cover expenses not to exceed $3000 per year. The Publisher shall be entitled to attend the annual Editorial Board meeting.

(b) In even-numbered years, should the Society wish to hold an additional meeting of the Editorial Board in conjunction with the International Association for the Study of Pain World Congress meeting, the Publisher shall cover expenses not to exceed $3000 per meeting. The Publisher shall be entitled to attend this Editorial Board meeting.

6.5 **Editorial Office Transition.** During the Term of this Agreement, the Publisher will pay a one-time grant up to fifteen thousand dollars ($15,000) to assist with the costs of transition to a new Editor-in-Chief of the Journal, in the event that the incumbent Editor-in-Chief's term expires prior to the end of this Agreement, provided the Society notifies the Publisher by June 30 for payment during the following calendar year.

6.6 **Editorial Retreat Grant.** The Publisher shall host and support, with funds of up to five thousand dollars ($5000) per retreat, an annual strategic editorial retreat to take place at a domestic Elsevier office or other location to be agreed by both parties. For reimbursement of expenses the Society shall submit an invoice to the Publisher not later than November 30 each year.

6.7 **Student Travel Award.** During the Term of this Agreement, the Publisher shall provide an annual grant of one thousand dollars ($1000) to be used for a student travel award for the Society's annual meeting. The award shall be given at the Society's discretion and may be tied to a competition for a paper to be published in the Journal. The Society shall submit an invoice for payment to the Publisher not later than October 31 each year.

6.8 **Complimentary Subscriptions.** During the Term of this Agreement, the Publisher will provide, without charge, up to 20 copies per issue of the Journal shipped in bulk to the Society's office.

6.9 **Taxes.** All monies provided to be paid under the terms of this Agreement are expressed exclusive of any sales, use, value added, withholding, stamp duties or similar taxes, which shall be payable to the receiving party by the paying party in addition to the monies due hereunder. Any value added tax (VAT) or similar tax due by either party to the other will be paid by the paying party upon issue by the receiving party of a valid VAT/tax invoice to the paying party.

6.10 **Publisher's Reports.** In addition to the annual royalty report described above, the Publisher shall produce and deliver an annual publisher's report to the Society detailing usage statistics, advertising pages and sales, production information, marketing activities and any other significant publishing activities undertaken. In addition, the Publisher shall provide the Society with quarterly financial statements.

6.11 **Complimentary Access.** The Publisher will provide complimentary access to ScienceDirect and Scopus to the Editor-in-Chief during the Term, pursuant to terms and conditions of use set and enforced by the Publisher.

6.12 **Signing Bonus.** As consideration for execution of this Agreement, the Publisher shall provide the Society a signing bonus $500,000, to be paid within sixty (60) days after signature of this Agreement by both parties. Upon termination for any reason prior to the end of the Initial Term, the Society will refund to the Publisher a pro rata portion of the signing bonus.

## ARTICLE VII
## DISCLAIMERS WITHIN JOURNAL/REPRESENTATIONS AND WARRANTIES

7.1 **Disclaimers Generally.** Each issue of the Journal shall include a disclaimer to the effect that no responsibility is assumed by the Publisher or by the Society for any injury and/or damage to persons or property as a result of any actual or alleged libelous statements, infringement of intellectual property or privacy rights, or products liability.

7.2 **Advertising Disclaimers.** Each issue of the Journal shall include a disclaimer to the effect that the publication of an advertisement in the Journal does not constitute on the part of the Publisher or the Society a guarantee or endorsement of the quality or value of the advertised products or services described therein or of any of the representations or the claims made by the advertisers with respect to such products or services.

7.3 **Representations and Warranties.** Each party represents and warrants as follows:

(a) such party has all requisite legal and corporate power and authority to enter into this Agreement and to perform its obligations hereunder;

(b) such party will exercise due care in carrying out its duties hereunder and will perform its services hereunder consistent with industry standards and with the quality and reputation of the Journal;

(c) such party's execution and delivery of this Agreement and its performance hereunder will not result in a breach of any agreement or contract by which such party is bound, or violate any applicable law or regulation, or such party's corporate or legal charter, or any judgment or order of any court or governmental agency with competent jurisdiction and authority over such party; and

(d) such party acknowledges and agrees that the other party does not make any representations, warranties or agreements not expressly set forth in this Agreement, and such party is not relying on any representations, warranties or agreements by the other party not expressly set forth herein.

## ARTICLE VIII
## PERSONAL DATA

8.1 **Data Processing.** Each party warrants and represents that the processing of personal data that it receives from the other under this Agreement will be for the purposes and in the manner

9

envisaged by this Agreement or as instructed in writing by the party supplying the data and in accordance with all applicable laws and regulations. Each party shall implement appropriate technical and organizational security measures aimed at protecting such personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and against all other unlawful forms of processing. The Society further warrants and represents that it has obtained any and all necessary consents to the processing of the personal data it supplies to the Publisher in accordance with the purposes and in the manner envisaged by this Agreement or as instructed in writing by the Society.

8.2 **Member Data.** The Society will provide to the Publisher, on a monthly basis and free of charge, an electronic file of Members' contact details to be used by the Publisher solely to create mailing labels for direct mailing to the Members of issues of the Journal.

## ARTICLE IX
## TERM AND TERMINATION

9.1 **Term.** The initial term of this Agreement ("Initial Term") will begin on January 1, 2018, and shall conclude on December 31, 2022. Notwithstanding the dates set forth herein, the parties agree that the provisions of this Agreement shall cover their respective rights and responsibilities relating to publication of the Journal beginning with the first issue of 2018 and concluding with the last issue of 2022 and that accordingly the performance of such rights and responsibilities associated with those issues may therefore extend outside such dates.

9.2 **Renewal.** This Agreement shall be automatically renewed for three (3) -year periods (each, a "Renewal Term") unless either party gives written notice to the other party at least twelve (12) months prior to the expiration of the then-current Term. The Initial Term and all Renewal Terms are collectively referred to as the "Term." In the event of cancellation by the Society for the purpose of considering bids or proposals from other publishers to publish the Journal, the Society agrees to give reasonable prior notice to the Publisher of such intent and permit the Publisher to submit a bid for a new publishing contract which proposal shall be considered in good faith and not unreasonably rejected by the Society.

9.3 **Termination.**

(a) Except as otherwise provided in this Agreement, either party may terminate this Agreement prior to the expiration of its Term if the other party fails to perform any of its material obligations hereunder or is in material breach of any of its representations, warranties or covenants contained herein, provided that the non-breaching party has provided written notice of such breach and the breach is not then cured within forty-five (45) days of receipt of such notice or, in the event of a breach that is not capable of cure, if the breaching party has not made reasonable provisions within forty-five (45) days to avoid a similar future breach.

(b) Either party may terminate this Agreement upon written notice in the event the other is insolvent, files a petition in bankruptcy or makes an assignment for the benefit of creditors.

9.4 **Effect of Expiration or Termination.**

(a) All sublicenses granted to third parties prior to expiration or termination shall continue through the end of their respective terms (subject to the Publisher's obligations to continue to pay any amounts due to the Society for such sublicensing activity).

(b) Subject to the terms of this Agreement and to compliance with all applicable laws and provided that the Publisher is then a current signatory of the Transfer Code of Practice published by NISO ("Transfer Code"), the Society and the Publisher agree to use commercially reasonable efforts to comply with the provisions of the then-current Transfer Code when

transferring the publication of the Journal from the Publisher to the Society or to a successor publisher. Where there is any conflict between the terms of this Agreement and the terms of the Transfer Code, the terms of this Agreement shall apply.

(c) With respect to subscribers to electronic versions of content from the Journal published and/or archived by the Publisher prior and up to expiration or termination of this Agreement, the Publisher may continue to provide to such subscribers access to subscribed-to content. Following termination or expiration, the Publisher may also provide all other current and future customers with electronic access to pre-2005 content published and/or archived by the Publisher in its backfile collections prior to termination or expiration, such non-exclusive license to be subject to the payment by the Publisher of any Royalty as provided in Section 6.1(a) or other sums due to the Society thereon.

With respect to Open Access Articles published and/or archived by the Publisher prior and up to expiration or termination of this Agreement, the Publisher may continue to make all or any part of such content available on a non-exclusive basis (subject to the Publisher's obligations to continue to pay any amounts due to the Society for such activity).

(d) After termination or expiration, (i) all rights to the subscriber data provided by the Society to the Publisher pursuant to this Agreement shall revert to the Society, except that the Publisher shall retain the right to use such data for the purposes set out in this Agreement to fulfil any obligations incurred by the Publisher pursuant to this Agreement, and (ii) the Publisher shall provide the Society with (1) a list of the names and postal addresses of Non-Member and Institutional subscribers, excluding institutions that received the Journal as part of a collection of titles at deeply discounted prices; and (2) the contact details for the Journal authors, editors and reviewers in the Publisher's online editorial management/manuscript submission tracking system or another system, in each case for the Society's use in connection with the publication, promotion and distribution of the Journal. The Society acknowledges that authors, editors and reviewer details may be held in common in the Publisher's online editorial management/manuscript submission tracking system with other journals published by the Publisher.

(e) The Publisher will transfer any existing Journal-specific domain name controlled by the Publisher to the Society at the Society's expense. If the URL for the Journal's home page is part of the Publisher's domain, then the Publisher will set up a URL re-direct to the new home page of the Journal on the Society's website for a period of twelve (12) months from expiration or termination of this Agreement. If requested by the Society, the Publisher will also (to the extent possible under the applicable terms of service and any applicable laws) transfer to the Society or to the Society's designee at the Society's expense any Twitter, Facebook or similar social media account relating solely to the Journal and controlled by the Publisher. If such transfer is not possible, Publisher agrees to cancel such accounts and to make no further use of the same.

(f) Upon termination for any reason prior to the end of the Term, the Society will refund to the Publisher a pro rata portion of any payments made in advance that have not yet been earned or accrued.

(g) No later than sixty (60) days following termination or expiration, the Publisher shall provide, if requested by the Society, electronic files of the editorial material comprising the Journal content (as transmitted to the Publisher by the Journal's authors and editors, including, where possible, supplementary information that forms part of an Article) in the Publisher's then currently available format at no further cost. The Publisher shall also deliver to the Society all available files, correspondence and unpublished editorial material that may be in existence at that time relating to preparations for publication of future issues. No later than sixty (60) days following expiration or termination, upon the Society's request, the Publisher shall ship all or

any back inventory of the Journal in the Publisher's possession subject to payment of the applicable shipment costs.

(h) Notwithstanding the foregoing, as between the parties the Publisher shall remain the owner of all computer hardware, software, electronic data files, codes, functionality, mobile formats and applications, search engines, websites, portals, resource centers and other assets and infrastructure provided by or on behalf of the Publisher and used in the submission, preparation and distribution of the Journal. The Publisher shall further remain the owner of any supplementary information or content created or commissioned by the Publisher (such as videos and podcasts) that does not form part of the Journal content as transmitted to the Publisher by the Journal's authors and editors.

9.5 Discontinuation of Journal. In the event the Society ceases to exist as an independent organization, except in the case of the Society merging with the International Association for the Study of Pain, and so long as the Journal continues to be published, the parties agree that the Publisher shall nonetheless continue to be able to exploit the rights that the Society provided to the Publisher under this Agreement on the same terms as are provided for under this Agreement. However, even in the event of such merger with the International Association for the Study of Pain, the Publisher is authorized to continue publishing the Journal for the remainder of the term of this Agreement if new issues of the Journal continue to be published, and in any event shall be entitled to continue to exercise the rights set out in Article 9.4 as set out therein. In the event the Society is unable or unwilling to continue the business of publishing the Journal, the Publisher shall have a right of first refusal to purchase all the legally available assets and rights of the Society associated exclusively with the Journal on reasonable terms and conditions.

## ARTICLE X
## GENERAL PROVISIONS

10.1 **Force Majeure.** Neither party's delay nor failure to perform any provision of this Agreement as a result of circumstances beyond its control shall be deemed a breach of this Agreement however, in the event that such delay or non-performance continues for a period of ninety (90) days or more and the parties are unable, after negotiating in good faith, to agree on a suitable remedy, the party subject to a material and substantial force majeure event ("FME Party") acknowledges that the other party shall have a right to terminate the Agreement upon receipt of written notice to the FME...

10.2 **Assignment.** Except as otherwise expressly provided herein, neither party shall directly or indirectly assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, prior written consent is not required if the Publisher assigns this Agreement to an affiliate or subsidiary that will maintain the Journal's professional stature or sells or transfers all or substantially all of its assets. Further, in the event that the Publisher assigns this Agreement in a merger or sale or transfer of assets of the Publisher, the Society may terminate this Agreement, with no penalty, in writing within one hundred eighty (180) days of receiving Publisher's written notice of such assignment.

10.3 **Entire Agreement/Severability/Waiver/Modification/Binding Effect.** This Agreement represents the entire Agreement between the parties in relation to the subject matter hereof and supersedes any previous agreements whether written or oral. The provisions of this Agreement shall be severable, and in the event that any provision of this Agreement is found to be legally unenforceable, such unenforceability shall not prevent the enforcement or any

other provision of this Agreement. The waiver by either party of any breach or failure to enforce any of the terms of this Agreement at any time shall not constitute a waiver of any term hereof. This Agreement may be modified or amended only by a written document executed by both parties. This Agreement shall be binding upon and inure to the benefit of the permitted successors and assigns of each party.

10.4 **Notices.** All notices under this Agreement shall be given in writing by a representative of the notifying party to a representative of the other party and shall be effective upon the earlier of actual receipt by the receiving party representative or three (3) days after deposit into overnight courier delivery service addressed to the other party at the address given herein or at such other address about which the notifying party shall have been informed from time to time.

10.5 **Relationship.** Nothing in this Agreement shall be deemed to create any employer/employee, agency, fiduciary, joint venture, partnership or other similar relationship between the parties.

10.6 **Governing Law.** Regardless of the place of physical execution of this Agreement or of its delivery, this Agreement shall be treated as though executed within New York, USA (the "Governing State"), and shall be governed and interpreted according to the laws of that Governing State.

10.7 **Confidentiality.** The Publisher and the Society shall each maintain all of the other party's Confidential Information (as defined herein) in strict confidence, will not disclose any Confidential Information to any third party other than as necessary to perform the obligations set forth in this Agreement and will protect such information with the same degree of care that such party exercises with its own Confidential Information, but in no event less than a reasonable degree of care. For the purposes of this Agreement, "Confidential Information" means any business, financial, operational, customer, vendor and other information disclosed by one party to the other and not generally known by or disclosed to the public or known to the receiving party solely by reason of the negotiation or performance of this Agreement and shall include, without limitation, the terms of this Agreement.

10.8 **Survival.** The representations and warranties set out in this Agreement and the General Provisions articles shall survive the expiration or termination of this Agreement.

IN WITNESS WHEREOF, the undersigned execute this Agreement.

**AMERICAN PAIN SOCIETY**

By: *Catherine Underwood* (DocuSigned)

Name:   Catherine H. Underwood, MBA, CAE

Title:   Chief Executive Officer

**ELSEVIER INC.**

By: *Linda Gruner* (DocuSigned)

Name:   Linda Gruner

Title:   VP, Health and Medical Sciences

14

**ANNEX 2.1 – AIMS AND SCOPE** The Journal of Pain publishes original articles related to all aspects of pain, including clinical and basic research, patient care, education and health policy. In addition, invited critical reviews, including meta-analyses of drugs for pain management, invited commentaries on reviews and letters to the editor are published in the Journal. The mission of the Journal is to improve the care of patients in pain by providing a forum for clinical researchers, basic scientists, clinicians and other health professionals.

**EXHIBIT B**

**Agreement for Elsevier to Publish the *Journal of Pain* Through 31 December 2019**

CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY – SUBJECT TO FINALIZATION OF AN AMENDMENT TO THE CONTRACT AS DEFINED BELOW AND BANKRUPTCY COURT APPROVAL

Background:

Elsevier Inc is the Publisher of *Journal of Pain* (JOP), previously owned by the American Pain Society (APS) and is a signatory to a Journal Publishing Agreement with the APS dated September 7, 2017 for a term of 5 years (from 1 January 2018 to 31 December 2022) ("the Contract").

The APS filed for bankruptcy on June 28, 2019. On July 22, 2019, Elsevier sent a Notice of Termination of the Contract the Michael Desmond, Chapter 7 Trustee ("Trustee") of APS. Notwithstanding the Notice of Termination, Elsevier has continued to publish the JOP. The Trustee has disputed Elsevier's right to terminate the Contract and the parties have reached an agreement to settle the dispute pursuant to the terms set forth below, subject to Bankruptcy Court Approval, whereby Elsevier has agreed continue the monthly publishing of the JOP through 31 December of 2019 ("the Termination Date").

Proposed terms for Elsevier to continue to publish JOP on a monthly basis for the months of September, October, November, and December 2019 ("this Agreement"), with this Agreement terminating on the Termination Date, are as follows:

1. Trustee to confirm that the current Editor-in-Chief (Dr. Mark Jensen) and his editorial team will continue to work on the journal through December 2019. Elsevier will continue to provide the systems, workflows, and resources required to produce the journal in accordance with the Contract.

2. Trustee will pay Elsevier promptly the member monthly subscription fees accrued for the July through December 2019 issues. The subscription fees vary each month with the number of subscriptions. Elsevier will issue a monthly invoice for payment based on the number of member subscribers served which should be paid within 30 days of invoice. The Trustee will pay Elsevier the outstanding invoices for the months of July 2019, August 2019, and September 2019 in the amounts of $6,992.64, $9,007.49, and $9,007.49, respectively. Elsevier shall be entitled to an allowed Chapter 7 administrative claim pursuant to 503(b) for any unpaid subscription fees accruing between July 1, 2019 and December 31, 2019.

3. Trustee to provide Elsevier promptly with a member list for the remaining 2019 issues as and when requested by Elsevier.

4. Elsevier will continue to keep the existing submission site of JOP open for further submissions until October 31 2019 or any later date if mutually agreed in writing with the Trustee.

5. Elsevier shall be required to pay the Trustee for any royalties accruing between the period from July 1, 2019 through December 31, 2019, if any, pursuant to Section 6.1 of the Contract, and will provide a statement to the Trustee pursuant to Section 6.1(c) within a reasonable period of time following the expiration of this Agreement ("the Final Accounting"). Trustee acknowledges that Elsevier has already provided the Trustee with an estimated calculation of the royalties accrued as of the beginning of the month of September 2019, and estimated royalties earned totalled only $137,799.86, less than the Minimum Guarantee amount of $250,000 already paid to APS for the calendar year. Accordingly, Trustee acknowledges that

Elsevier estimates that no additional royalties beyond the Minimum Guarantee will be due for 2019 and that APS may, in fact, not be entitled to any further royalties under the terms of the Contract, depending on the outcome of the Final Accounting.

6. Elsevier shall be required to pay the Trustee for Editorial fees pursuant to Section 6.2 of the Contract through December 31, 2019.

7. Pursuant to Section 6.12, Elsevier paid in advance to the APS a signing bonus of $100k per year, for a total of $500k paid to the APS for the original five-year term of the Contract. The pro-rata portion of the signing bonus (for the period from 1st January 2020 to 31st December 2022) is repayable to Elsevier ($300k), minus the unpaid portion of the editorial fees that would otherwise be due under the Contract for the period from 1st July 2019 to 31st December 2019 ($121,061). Upon the expiration of this Agreement, Elsevier shall have an allowed administrative expense for $50,000 of the signing bonus ("the Allowed Administrative Expense"). Such administrative expense shall be reduced by any unpaid royalties and editorial fees accruing between the period from July 1, 2019 through December 31, 2019 which are due to the Trustee pursuant to this Agreement. Further, Elsevier shall have an allowed unsecured pre-petition claim for the pro-rata portion of the signing bonus repayable to Elsevier, net of the Allowed Administrative Expense, estimated to be $250,000.

8. This Agreement can only be assigned/transferred to a third party (including any purchaser of the JOP) upon prior written consent of Elsevier and the Trustee.

9. Elsevier shall cooperate with reasonable requests from the Trustee for information detailing usage statistics, circulation, advertising pages and sales, production information, marketing activities and any other significant publishing activities to assist the Trustee is selling the Estates right to the Journal of Pain. In addition, Elsevier shall provide the Trustee with Publisher Reports and quarterly financial statements as provided in section 6.10 of the Contract.

10. Trustee releases any and all claims, rights, and causes of action that APS had or may have against the Elsevier arising out of the issuance of the Notice of Termination.

11. Elsevier releases all other claims, rights, and causes of action against the Estate except as provided for in this Agreement.

12. All other terms of the Contract shall remain in full force and effect except as provided herein. If there is a conflict between the terms of the Contract and this Agreement, the terms of this Agreement shall control.

13. This Agreement shall terminate on December 31, 2019. Following termination or expiration of this Agreement, the provisions of Article 9.4 of the Contract shall continue to apply except that Elsevier shall have no further payment obligations under this clause.

14. This Agreement is expressly conditioned upon Bankruptcy Court approval in the case of *In Re: American Pain Society, Case No. 19-18467.*

IN WITNESS WHEREOF, Trustee and Elsevier have caused their names to be signed hereto individually or by a respective duly authorized officer as of the date first above written.

**MICHAEL K. DESMOND**, not individually but solely in his capacity as Chapter 7 Trustee for the bankruptcy estate of AMERICAN PAIN SOCIETY

_____

Michael K. Desmond

**ELSEVIER INC.**

_____

By:
Its: